NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0950n.06
Filed: December 5, 2005

No. 05-1064

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| TONY RAMONE POTTER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**Before: GILMAN AND COOK, Circuit Judges; and CARR, District Judge.**[*]

**JAMES G. CARR, DISTRICT JUDGE**. This is an appeal from a conviction following the defendant's conditional plea of guilty to drug and gun-possession charges. The defendant asserts a single issue on appeal: namely, that a search warrant for his residence was not based on probable cause.

For the reasons that follow, we AFFIRM the judgment of the district court.

**BACKGROUND**

The affidavit on which the search warrant was based stated that the affiant had contacted a confidential informant [CI] around 8:00 p.m. on September 18, 2002, and the informant "advised that 111 East Euclid St. is currently involved in the sale and trafficking of crack cocaine . . . operated by Tony Ramone Potter . . . of that residence." (J.A. at 90, ¶ 3.)

---

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

The affidavit further stated:

4. CI advised that CI has been purchasing crack cocaine from Tony Potter once or twice a month for approximately the last four to five years.

5. Affiant as well as the officers listed above then set up a controlled buy with the CI. CI was body searched by Sgt. Kantor with no drugs, paraphernalia, or money being found on his person. CI's vehicle was also searched by Affiant and Sgt. Kanto with no drugs, paraphernalia, or money being found in it.

6. CI then drove CI's vehicle from the Jackson Police Department to a driveway near the intersection of Belden St. and Addison St. While driving to this location, CI was alone driving CI's vehicle while Sgt. Kantor and Affiant followed CI in an undercover vehicle. At the location we were joined by Detective Gonzalez, who was already on location.

7. CI then entered the vehicle occupied by Affiant and Sgt. Kantor while Detective Gonzalez remained with CI's vehicle. Affiant then drove to the intersection of South St. and Airline Dr. specifically the parking lot of the Southside Deli at that location. At that location CI attempted to contact Tony Potter from the pay phone there. This pay phone was malfunctioning so CI reentered Affiant's vehicle and Affiant went to the parking lot of the Buddy's Gas Station on the Northeast corner of the same intersection.

8. From the pay phone located at this location, CI called 812-1638 the cell phone believed to be owned by Tony Potter. On the first call the phone was

2

not answered, however CI left a voice mail on the phone stating that the CI was in town and would call Tony back soon.

9. CI then waited approximately three to five minutes and called the same number again from the pay phone at Buddy's. CI then made contact with a person he called "Ton" and later stated was in fact Tony Potter. CI then set up a buy and told "Ton" that he would see him in approximately 5 min. After the conversation ended CI re-entered Affiant's vehicle and was transported back to CI's vehicle where Detective Gonzalez was waiting. CI advised that the buy would take place in front of 111 E. Euclid St., Potter's residence.

10. CI then entered their vehicle and drove Southbound on Belden St. Westbound on South St. then Northbound on Francis St. to the intersection of Francis St. and Euclid St. During this entire route CI was alone in CI's vehicle while being followed by Affiant and Sgt. Kantor in Affiant's vehicle.

11. CI then turned Eastbound on Euclid St. where Detective Gonzalez could observe the vehicle.

12. Detective Gonzalez advised that CI drove to 111 E. Euclid St. and stopped in front. CI's vehicle was then entered by a subject, later identified as Charles Suddeth DOB: 07/20/58 while another subject, later identified as Tony Potter remained outside the vehicle between 111 E. Euclid St. and the CI's vehicle.

13. Suddeth entered the vehicle for approximately 30 seconds and then exited the

3

vehicle.

14. CI's vehicle then turned around using a driveway and drove directly to the Jackson Police department being observed by either Detective Gonzalez or Affiant the entire drive.

15. At the Jackson Police Department, CI turned over 3 rocks of suspected crack cocaine to Sgt. Kantor. Affiant then field tested suspected crack cocaine and it tested positive for evidence of cocaine.

16. CI was again searched by Sgt. Kantor. As well, CI's vehicle was then searched by Affiant. No other drugs, paraphernalia, nor money were located on CI nor in CI's vehicle.

17. Today on September 22, 2003, at approximately 1930 hours, CI again responded to the Jackson Police Department where CI was met by Sgt. Kantor. Sgt. Kantor again set up a controlled buy with CI. CI was provided with pre-recorded buy funds.

18. CI was body searched by Officer Adam Williams as well, his vehicle was searched by Officer Matt Peters. No drugs, paraphernalia, or money were located on CI or in vehicle.

19. CI then drove to the Buddy's station at the intersection of Airline Dr. and South St. where CI then set up a buy with Tony Potter.

20. CI then drove to the Party Pak on Francis St. betweeen Euclid St. and Mansion St.

21. While the CI was driving to the Party Pak, Affiant was in an observation

4

point for 111 E. Euclid St. While there, Affiant saw a subject, later identified as Charles Suddeth exit 111 E. Euclid St. with an unknown black male. They then walked to [sic] Westbound to Francis St., then Southbound on Francis St.

22. At the Party Pak, Officer's [sic] Peters, Williams, and Sgt. Kantor observed the CI enter the parking lot. Suddeth then entered CI's vehicle for approximately 20 seconds. Suddeth then exited CI's vehicle.

23. CI then drove from the Party Pak directly to the Jackson Police Department where CI turned over 4 rocks of suspected crack cocaine to Sgt. Kantor. The rocks were then field tested by Officer Peters where they tested positive for evidence of crack cocaine.

24. CI was then body searched by Sgt. Kantor and CI's vehicle was searched by Officer Williams with no drugs, paraphernalia, or money found on CI or in CI's vehicle.

25. After the buy took place, Affiant observed Suddeth come from Francis St. to 111 E. Euclid St. and enter 111 E. Euclid St. The unknown black male accompanied Suddeth to 111 E. Euclid St. then left that location walking Westbound.

(J.A. at 90-91.)

We review the issuing judge's factual findings using a clearly erroneous standard, and evaluate the judge's legal conclusions *de novo*. *United States v. Smith*, 182 F.3d 473, 476 (6th Cir. 1999).

5

**DISCUSSION**

The defendant argues that the information connecting the premises to be searched, 111 E. Euclid, with drugs was not sufficient to enable the issuing judge to find probable cause that drugs would be found at that location. He also asserts that the affidavit does not disclose a basis for finding the informant credible and reliable, and that the informant's information was not corroborated.

We turn first to the issue of the informant's reliability and credibility (i.e., how the informant knew what he was talking about and why the issuing judge could give credence to what he said).

The informant knew what he was talking about because he was relaying first-hand information and experience: he had been purchasing crack cocaine from the defendant once or twice a month for the previous four to five years. It is reasonable, in light of that representation, to conclude that the informant's information about the premises being "currently involved in the sale and trafficking of crack cocaine" and being "operated by Tony Ramone Potter" likewise is based on personal observation and experience. Someone who has been buying drugs knows where he has been getting them.

The issuing judge could reasonably give credence to the informant's information because, under the affiant's supervision and shortly before the request for the warrant, the informant had successfully completed two controlled purchases of crack cocaine. Both buys occurred after the informant had made arrangements with a person whom he said was the defendant to buy crack cocaine.

The defendant was on hand when the first buy occurred outside the premises. This conjunction of person, premises, and contraband – a showing, in effect, on the informant's part that

6

he could "deliver" on what he was saying about the defendant as a drug dealer – makes what he says is going on at the premises plausible and worthy of belief.

We conclude, accordingly, that the issuing judge had an ample basis for finding the information provided by the informant reliable, because it was based on the informant's own experience and activities. The judge also had an ample basis for finding the informant to be truthful in view of the successful controlled buys and the defendant's presence at one of those buys, which had taken place outside premises described as his residence.

The remaining issue is whether these facts sufficed to establish probable cause to believe that drugs would be found at 111 East Euclid. We conclude that they did.

The affidavit recites that 111 East Euclid is a two-story single family residence. The affiant gave an exacting description of the structure's appearance; the degree of detail makes clear that he is reporting that description on the basis of his own observations or those of fellow officers. He also reports that that is the defendant's residence; observation of the defendant near the building during the first controlled buy confirms the likelihood that such is so.

Having connected the defendant to the premises and shown cause to believe that he was a drug dealer, the affiant recited circumstances about the controlled buys that made the necessary connection between the defendant's drug dealing and the probable presence of drugs in the premises.

To be sure, those buys did not happen inside the premises. But one occurred in front of the premises and in the defendant's presence, although he did not deliver the drugs himself. But he could see what was going on, and his presence confirms his likely involvement in the transaction. The other controlled buy involved the same courier, who was seen going into the premises after the second sale had been consummated. His return to that location increased the likelihood that it

7

contained drugs

This set of circumstances, in our view, sufficed to persuade the issuing judge that drugs were likely to be found at the described location, which was shown to have been the residence of a long-time drug dealer, proximate to where the first sale occurred, and where the courier in both sales returned immediately after the second sale.

## CONCLUSION

Finding no error in the trial court's denial of the defendant's motion to suppress, we **AFFIRM** the judgment of the district court.