**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0768n.06

No. 08-1364

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Dec 16, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| RODNEY TILLMAN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: MOORE, SUTTON and McKEAGUE, Circuit Judges.

SUTTON, Circuit Judge. Rodney Tillman challenges the district court's denial of his motion to suppress, claiming the police lacked probable cause to arrest him. We affirm.

I.

On May 8, 2007, at 7:00 p.m., Grand Rapids Detective Mark Waichum received a tip from a confidential informant regarding a possible drug sale. The informant had been "registered" with the police department for more than two years, which meant he had satisfied a background check and undergone at least three "reliability buys" to prove that he "kn[ew] the drug game," R.42 at 5–6. Waichum knew the informant well, having worked with him "at least twice a week" for the prior two years, *id.* at 7. He also had acted as the informant's "main handler" after "develop[ing] the informant" to confirm he was "reliable and credible," *id.* at 6–7.

The informant had an "extremely strong" track record. *Id.* at 78. While working with Waichum, the informant had made over 105 controlled buys and provided information that led to 25 search warrants and 45 arrests, the "large majority" of which led to convictions. The informant provided tips to the police for money, not for leniency from a conviction, and he had never provided any false information.

On May 8, the informant told Waichum that he had just seen someone at the Friendly Tavern with "a ton of dope" on him for sale. *Id.* at 8. He described the suspect as a "[h]eavy set, black male, with braids, glasses, striped shirt on, and blue jean shorts." *Id.* at 9.

Waichum and another detective quickly responded to the tip. Waichum had patrolled the area surrounding the bar for nine years as part of the vice squad and knew of the bar's "propensity for drugs and drug sales, fighting, weapons violations, prostitution." *Id.* He also knew that the Friendly Tavern had become a favorite spot for drug deals after another bar popular with drug dealers had shut down.

Because Waichum and the other detective worked undercover, they called in the "Special Response Team" to make the arrest. *Id.* at 11. While they waited near the front door of the Tavern for the team to arrive, Waichum spoke by phone with the informant, who was down the street relaying "live time information" to Waichum. *Id.* at 12. When Tillman stepped outside of the bar, the informant said, "That's him right there. That's him." *Id.*

Officer Gregg Arsenault, a member of the Special Response Team, entered the bar with two other officers. They spotted someone matching Tillman's physical description and saw Tillman put his hands down toward his waistband. Suspecting Tillman was armed or might try to dispose of the drugs, the officers immediately arrested him and discovered a loaded firearm in his waistband and five bags of crack cocaine.

A federal grand jury indicted Tillman for possessing cocaine base with the intent to distribute it, using a firearm in relation to a drug crime and being a felon in possession of a firearm. Tillman moved to suppress the evidence, arguing that the officers lacked probable cause to arrest him. The district court held a suppression hearing at which Waichum and Officer Arsenault testified. The court denied Tillman's motion, and Tillman pled guilty, reserving the right to appeal the suppression ruling.

## II.

In determining whether the police had probable cause to arrest Tillman, we apply a totality-of-the-circumstances test. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983). At least three circumstances potentially bear on a probable-cause determination premised on an informant's tip: (1) the reliability of the informant; (2) the basis of the informant's knowledge; and (3) any police corroboration of the informant's tip. *Id.* at 238, 241–42. Each consideration cuts against Tillman.

After crediting Waichum's testimony, the district court found that the informant's reliability was "extremely strong," relying on the fact that Waichum and the informant had worked together for nearly two years, that the informant had never provided false information and that he had helped the police make several valid arrests. *See* R.42 at 77–78. When the "prior track record of an informant adequately substantiates his credibility," we do not necessarily require "other indicia of reliability" to find probable cause. *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999).

The police had more than just the informant's reliability, however. Waichum knew the tipper's identity. Unlike a tip from an anonymous informant, a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is far more trustworthy. *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

The informant's first-hand knowledge of the crime also supports the district court's decision. Having just seen Tillman possess drugs at the Friendly Tavern, the informant had a clear basis of knowledge for the tip. R.42 at 8. When an informant observes a crime "first-hand," that "entitles [the] tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234; *see also United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc) (When a "known person . . . to whose reliability an officer attests with some detail . . . has seen a particular crime and particular evidence," probable cause exists to issue a search warrant.).

Although police corroboration is not necessary when the tip comes from a known reliable source who has personally observed criminal activity, *see id.* at 976, the police nevertheless verified

- 4 -

some of the tip. When Waichum spotted Tillman step outside the Friendly Tavern, he matched the physical description given by the informant, adding one more data point to the probable-cause calculation. If police have "personally verified every facet of the information" provided, save the existence of the drugs on the person, they have "reasonable grounds" to believe that the "remaining unverified bit . . . was likewise true." *Draper v. United States*, 358 U.S. 307, 313 (1959).

Tillman questions the court's finding that the informant's reliability was "extremely strong," claiming there was "insufficient inferential statistical support" for the point. Tillman Br. at 36. Tillman points out that Waichum worked with the informant twice a week for two years, using the informant to conduct 105 controlled buys and obtaining enough information to administer 25–30 search warrants and 45 arrests. From this, Tillman deduces, Waichum and the informant had "about two hundred engagements," but obtained "only 30 search warrants," produced evidence for arrests in "less than half of the cases," and thus had a low "productivity rate" of 20%. Tillman Br. at 34–36 & n.11. But to say that Waichum "worked with" the informant twice a week is not to say that they did anything more than talk and exchange information on an ongoing basis. That the 200 conversations did not lead to 200 arrests does not mean that each conversation, or any of them for that matter, involved a false tip. The record says nothing about whether each conversation between Waichum and the informant involved a discrete tip about a discrete crime, and Tillman never explored the point during cross-examination.

The premise of the argument also is a dubious one. Good detective work often involves many interactions with a suspect before an arrest occurs. *See, e.g., United States v. Graham*, 622

F.3d 445 (6th Cir. 2010) (police made six controlled buys in various locations before arresting defendant and other conspirators); *United States v. Malveaux*, 350 F.3d 555 (6th Cir. 2003) (informant made five separate controlled buys before police sought a warrant).

Tillman questions the informant's "accuracy and truthfulness" on the independent ground that he possessed only 30 grams of crack cocaine and the informant said he had a "ton of dope." Tillman Br. at 34. Possession of 30 grams of crack cocaine for sale supports the main point of the tip—that the suspect possessed enough of the drug to be distributing it. Whether in the world of drug informants, as opposed to the world of Webster's, 30 grams of crack cocaine amounts to a "ton of dope" may be open to debate. But no one took the informant to be speaking literally, and the punishment given for a prior drug felon (like Tillman) for this offense, a minimum 10-year prison sentence, *see* 21 U.S.C. § 841(b)(1)(B)(iii), may suggest the amount is not inconsequential.

Tillman contests the court's finding that the Friendly Tavern had a reputation for illegal activity, pointing to police records showing only five drug-related incidents in the five years prior to Tillman's arrest. But a glance at the police report puts the finding in context. It shows over 100 incidents at the Friendly Tavern's address during the period between the date of Tillman's arrest, May 8, 2007, and September 24, 2002, including assaults, stolen cars, larceny, fighting, burglary, robbery, domestic violence, carrying a concealed weapon, attempted suicide and gun shots. This was not the Grand Rapids version of Cheers. The report also contains a large number of incidents that simply say "field contact report," "suspicion," "trouble with a person" or that have no description at all. *See* R.16-2. The district court permissibly credited Waichum's testimony about the bar's

reputation based on the officer's first-hand observations during a nine-year vice beat, and the court relied as well on the bar's lengthy history of police incidents.

*United States v. Hughes*, 898 F.2d 63 (6th Cir. 1990), is several steps removed from this case, as the police in *Hughes* did not have the benefit of a tip from a reliable informant. That Tillman did not try to flee "after being confronted," *id.* at 64, whereas Hughes did, thus makes little difference to *this* probable-cause assessment.

Tillman says that the government should have disclosed the identity of the informant to him. But Tillman never sought such a disclosure in the district court, and at any rate he forfeited the argument by raising it in a footnote in a "perfunctory manner unaccompanied by some effort at developed argument," *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008).

Tillman adds that because the police arrested him in a commercial establishment, that by itself establishes the necessity of a warrant. He did not raise this argument below, and thus his contention receives plain-error review. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734–35 (1993).

No error occurred, let alone a plain one. Assuming the police have probable cause, they do not need a warrant to arrest a felony suspect in a public place. *United States v. Watson*, 423 U.S. 411, 423–24 (1976). Tillman points to nothing in the record suggesting the Friendly Tavern was anything other than a local watering hole open to the public. So long as the "public was invited to enter and to transact business," Tillman had no reasonable expectation of privacy there. *Maryland*

*v. Macon*, 472 U.S. 463, 469 (1985).  Once Tillman "knowingly exposes [himself] to the public," he is no longer a "subject of Fourth Amendment protection" for the purpose of an arrest based on probable cause.  *United States v. Santana*, 427 U.S. 38, 42 (1976).

Tillman persists that the Friendly Tavern is not a public place because it excludes individuals that are under-age or intoxicated.  But an establishment otherwise open to the public does not alter its status merely because it applies generally applicable (and state-required) rules of exclusion. When the Supreme Court upheld police officers' warrantless entrance and purchase of obscene materials from an adult bookshop in *Maryland v. Macon*, the fact that the store presumably excluded minors mattered nothing to the Court's analysis.  *See* 472 U.S. at 469; *cf. United States v. Biswell*, 406 U.S. 311, 314–17 (1972) (heavily regulated establishments, including establishments that sell liquor, have diminished expectations of privacy because they are readily subject to inspection); *1064 Old River Road, Inc. v. City of Cleveland*, 137 F. App'x 760, 766 (6th Cir. 2005) (same).  No error occurred.

III.

For these reasons, we affirm.